**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 05 CR 931 |
| | ) | |
| DAVID CONRAD, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

AMY J. ST. EVE, District Court Judge:

Before the Court is Defendant David Conrad's motion to suppress all evidence gathered by law enforcement on December 20, 2002. (R. 96-1.) For the reasons below, the Court grants the motion in part.

## BACKGROUND

On November 16, 2005, the Government filed an information against David Conrad. On January 23, 2007, a federal grand jury returned a Superseding Indictment ("Indictment") charging Defendant David Conrad with eight counts of possessing, transporting, advertising and distributing child pornography in violation of 18 U.S.C. §§ 22251(c)(1)(A), 2251(d), 2252A(a)(2)(A), 2252A(a)(1), 2252A(a)(5)(B), 2252A(b)(1), and 2252A(b)(2). (R. 32-1.) In particular, the Indictment alleges that on July 12 and 14 and October 24, 2002, Defendant Conrad advertised, received or distributed, transported, and possessed at least six video images containing child pornography. Law enforcement obtained some of the evidence supporting the Indictment on December 20, 2002 after entering the back deck of Roger Conrad's Geneva,

Illinois residence, obtaining permission from Roger Conrad to enter the residence based on the agents' representations to Roger Conrad of their observations from the deck, interviewing David Conrad in the residence, and transporting David Conrad to his Chicago apartment after the initial interview.

Defendant Conrad has moved to suppress his statements to law enforcement on December 20, 2002, and any evidence obtained that day from his parents' residence in Geneva and from Defendant's Milwaukee Avenue apartment. On a motion to suppress "[e]videntiary hearings are not required as a matter of course; a district court need conduct a hearing only when the allegations and moving papers are sufficiently definite, specific, non-conjectural and detailed enough to conclude that a substantial claim is presented and that there are disputed issues of material fact which will affect the outcome of the motion." *United States v. McGaughy*, 485 F.3d 965, 969 (7th Cir. 2007) , citing *United States v. Villegas*, 388 F.3d 317, 324 (7th Cir. 2004); *see also United States v. Juarez,* 454 F.3d 717, 720 (7th cir. 2006); *United States v. Martin,* 422 F.3d 597, 602-03 (7th Cir. 2005), *cert. denied* 546 U.S. 1156, 126 S. Ct. 1181, 163 L. Ed. 2d 1139 (2006).

In support of his motion, Defendant submitted his own affidavit swearing that the factual events set forth in the motion are true. (R. 96-8.) Because this affidavit and the Federal Bureau of Investigation ("FBI") 302 reports created factual disputes and because they raised a substantial claim, the Court conducted a suppression hearing in order to make evidentiary determinations. That hearing took place on July 28, 29, and 31, 2008. Following the suppression hearing, the parties submitted post-hearing briefs addressing specific issues raised by the Court and addressed in detail below. (R. 170-1, 171-1.) As a general matter, "the

controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence." *United States v. Gillespie*, 974 F.2d 796, 800 (7th Cir. 1992).

## BACKGROUND FACTS

The following witnesses testified at the suppression hearing: FBI Special Agent Scott McDonough, FBI Special Agent Tracie Keegan, FBI Special Agent Susan Beckerman, FBI Special Agent Kevin Ellis, Palos Heights Police Department Sergeant Chuck Hankus, Palos Heights Police Department Sergeant Michael Zalifia, former Kane County Investigator Alejandro Gomez, Roger Conrad, and Elizabeth Conrad. During the hearing, the Court had the opportunity to carefully evaluate the demeanor and credibility of each witness. Both the government and Defendant also introduced numerous documentary exhibits, including photographic exhibits of the Conrads' Geneva residence and deck area.

Defendant David Conrad submitted an affidavit to support his version of the events. His affidavit, however, was once sentence stating "I, David E. Conrad, hereby swear and affirm that all of the information contained inmy motion to suppress is true and accurate as I recall and understand it." Defendant Conrad did not testify, and thus his assertions were not subjected to cross examination. Nor did Defendant provide the Court with the opportunity to assess the demeanor of his assertions while testifying. Given the credibility of the law enforcement officers who testified about their interactions with Defendant in the Geneva, Illinois home, and in the car on the way to Defendant's Chicago apartment, the Court affords Defendant's affidavit substantially less weight than the testimony of Agent Keegan and Sergeant Zaglifa. *See*, *e.g.*, *Untied States v. Baker*, 78 F.3d 1241, 1243 (7th Cir. 1996) ("Baker's Fourth Amendment claims

rest on his version of the facts. The district court, however, determined after a suppression hearing that Baker's version was not credible. Instead, the court chose to credit [Officer] Brophy's view of what happened. That determination – to credit Brophy's version rather than Baker's – cannot be clearly erroneous."); *United States v. Carlisle*, No. 04-CR-055-C, 2004 WL 1085194, at *7 (W.D. Wis. May 7, 2004) ("[Defendant] claims that things were even worse than this, but I have accorded slight weight to his affidavit. First, although the affidavit is admissible in a suppression hearing, [Defendant] declined to subject his assertions to cross-examination or a demeanor check by taking the stand."); *United States v. Frank*, 8 F. Supp. 2d 284, 291 n.2 (S.D.N.Y. 1998) ("[s]ince Frank did not testify at the hearing, and was not subject to cross-examination, the Court was unable to form an opinion as to his credibility or the truthfulness of his allegations"). Similarly, Agent McDonough interacted extensively with Defendant at Defendant's apartment in Chicago, Illinois. The Court addresses the specifics below, but the Court affords Defendant's one sentence affidavit substantially less weight than Agent McDonough's credible testimony that is corroborated by documents and other testimony.

The Court makes the following factual findings based on the evidence presented at the suppression hearing, as well as the other evidence submitted during the briefing on the motion to suppress. Although the parties disputed many factual issues surrounding the events on December 20, the Court only addresses those necessary to resolve the pending motion to suppress.

## I.     Roger's Machinery

On December 18, 2002, the FBI obtained a valid search warrant for Roger's Machinery Sales shop ("Roger's Machinery"). The warrant was based on information collected by law

enforcement, including undercover work by Sergeant Zaglifa, reflecting that someone using an Internet Protocol ("IP") address registered to Roger's Machinery had engaged in the distribution of child pornography. Two days later, on December 20, 2002, the FBI positioned a team of agents at Roger's Machinery and another team of agents at the Geneva, Illinois home of Roger Conrad, the owner of Roger's Machinery. The FBI executed the search warrant at Roger's Machinery in the early morning hours, but their search yielded no child pornography. Roger Conrad was on vacation at the time of the search, but employees provided the FBI with Roger Conrad's phone number where he could be reached. During the course of the search of Roger's Machinery, FBI Special Agent Scott McDonough telephoned Roger Conrad, but much of the substance of that conversation is disputed. It is beyond dispute that Agent McDonough asked Roger Conrad the whereabouts of Roger's son, Defendant David Conrad, and that Roger Conrad told the FBI that David Conrad was most likely at the family residence in Geneva. The Government contends that at the time the search of Roger's Machinery was executed, Roger Conrad's son, David Conrad – not Roger – was the primary suspect in the child pornography investigation.

## II.     Conrad Family Home in Geneva, Illinois

At the same time the FBI was searching Roger's Machinery, a team of law enforcement officials attempted to make contact with the occupants of Roger Conrad's family home in Geneva, Illinois (hereinafter "the Geneva Residence"). The evidence revealed that the agents called the telephone line in the Geneva Residence and knocked on the door multiple times, but no one answered. Specifically, commencing at approximately 7:00 am, law enforcement agents knocked on the door and rang the doorbell five separate times at 30 minute intervals. At

approximately 9:00 am, Special Agent McDonough talked to Roger Conrad on the telephone. Special Agent McDonough informed Roger Conrad that FBI agents were at his Geneva Residence looking for his son, David Conrad. When Agent McDonough inquired about David Conrad being at the Geneva Residence, it is undisputed that Roger Conrad asked the agents to look in the driveway and see what cars were present. In response, the agents looked in the driveway and Agent McDonough communicated to Roger Conrad that a black Porsche was in the driveway. Roger Conrad then informed the agents that the black Porsche belonged to David Conrad and that he was at the Geneva Residence because his vehicle was there. At some point, Roger Conrad gave the agents David Conrad's cell phone number and the phone number to the Geneva Residence and told them to call. The agents were never able to reach David Conrad on the telephone. It is also undisputed that Roger Conrad did not give any law enforcement agents permission to go to the back of his Geneva residence or to enter the back deck at the Geneva Residence.

After receiving this information, the law enforcement agents – without permission – proceeded to the back of Roger Conrad's Geneva Residence. The home did not have a fence around it or any other obstruction around its perimeter. Further, there was no specific path or pathway leading from the front of the home to the back of the home. Sergeant Zaglifa testified that he walked to the back of the Geneva Residence where he found sliding glass doors that entered into the lower level of the home. He knocked on these doors and looked into them, but no one answered and he did not see anyone. Law enforcement officers then proceeded up a set of back stairs that led to a deck attached to the back of the Geneva Residence. The rear deck abutted the main living level of the home and was accessible from the stairs. The stairs had a

railing about 39 to 40 inches high.  The same railing enclosed the back deck.  At the top of the back stairs, a gate separated the stairs from the deck.  The gate contained a latch, but not a lock. The latch secured the gate.

The officers walked up the stairs, opened the gate, and entered the back deck without permission.  They walked onto the deck and up to glass doors.  The back glass doors opened directly onto the deck.  The officers looked through the doors and the windows, but initially did not observe anyone.  They looked directly into the main living area of the Geneva Residence, including the kitchen.

While on the back deck, it is undisputed that the officers subsequently observed David Conrad on the couch in the family room of the residence.  They could not observe him from the back sliding glass doors.  Instead, the evidence revealed that the officers saw him through a bay window of the Geneva Residence off to left of the sliding glass doors.  The bay window is not directly over the deck – instead, the officers had to stand or lean on the railing of the deck to see into the window.  The agents also observed an open pill bottle.  The precise location of the pill bottle, however, is not relevant to this analysis because it is clear that the agents saw an open pill bottle somewhere in the general vicinity of where David Conrad was lying on the couch.

Agent McDonough then called Roger Conrad in Florida to relay what law enforcement had seen related to David Conrad.  Although Roger Conrad and Agent McDonough tell very different versions of what was relayed during that conversation, the Court need not resolve this factual dispute.  Agent McDonough admits that he mistakenly informed Roger that the pills were on the coffee table next to David Conrad.  He also informed Roger Conrad that his son was on the couch, not moving, and they were concerned about him.  Based on Agent McDonough's

representations of what the agents had observed from looking into a window off the back deck of the Geneva Residence, Roger Conrad ultimately informed Agent McDonough where the family hid the spare key and granted agents permission to enter the residence to check on his son. The FBI obtained the hidden key and entered the Geneva Residence. Shortly after entering, the agents confirmed that David Conrad was in good health and simply sleeping on the couch.

Agent Keegan testified that the law enforcement officers immediately identified themselves to Defendant, and waited a couple of minutes for him to be fully alert. She credibly testified that David Conrad was fully alert and responsive when they questioned him. Once he was alert, Agent Keegan questioned Defendant about child pornography, and Defendant made inculpatory statements in response to the questioning. According to Agent Keegan's testimony, David Conrad made "a spontaneous statement -- he says I think I have some child pornography on my laptop in the Porsche." When Agent Keegan told David Conrad that they would want to have that child pornography as well, David Conrad willingly went out to his Porsche and got it for her. Both Agent Keegan and Sergeant Zaglifa testified that Defendant then retrieved the laptop from his vehicle and willingly turned it over to law enforcement.

Defendant does not dispute this sequence of events but claims that he has only a hazy recollection of the minutes surrounding his being awakened by law enforcement. In his written submission that is verified through his affidavit, Defendant contends that his mental state was impaired due to the fact that he had only been asleep for a few hours and that he had taken prescription hydrocodone, a narcotic painkiller, prior to going to sleep. Defendant, through his one sentence affidavit averring that his motion is accurate, claims that he "simply does not remember what specific questions were asked immediately after he awoke." (R. 96-1, at 6.) He

claims that he "did not acknowledge ever possessing child pornography." (*Id.*) Defendant also avers that he "remembers giving the agents a computer that was stored in his car." (*Id.*) The Court finds the testimony of the officers credible and rejects Defendant's one sentence adoption of these assertions in his motion.

Sergeant Zaglifa credibly testified – corroborated by Agent Keegan's testimony – that Defendant took Sergeant Zaglifa out to his Porsche, retrieved the laptop, and gave it to Sergeant Zaglifa. Defendant told the officers that he had an apartment in Chicago where he resided. Defendant told Sergeant Zaglifa that he had another computer at this Chicago apartment, but "the hard drive had gone bad or something on this particular computer that was at his apartment."

When Agent Keegan asked Defendant if he would take the them to his apartment, Defendant willingly agreed. Agent McDonough corroborated that Agent Keegan told him that day that Defendant had agreed to take the agents to his Chicago apartment. Agent Keegan told Defendant that he was not in custody, that he did not have to go to Chicago with them, and that he was "basically going voluntarily." She did not place him in handcuffs or restrain him. They departed the Geneva Residence approximately 15 minutes after they entered it on December 20, 2002. At no point did the law enforcement officers search the Geneva Residence.

Agent Keegan drove the vehicle with Sergeant Zaglifa in the passenger seat. Defendant sat in the back seat, in the middle of the seat. The drive from the Geneva Residence to Defendant's Chicago apartment took approximately one hour. During the drive, Defendant smoked a cigarette and used his own cellular phone to call his father. During their telephone conversation, Roger Conrad told his son not to talk to the officers. According to Sergeant

Zaglifa's credible testimony, Defendant responded that "it's no problem."  Defendant did not complain to his father during this conversation about his treatment or the agents' actions.  During the ride downtown, Defendant did not ask to place any other calls, the officers did not restrict his ability to place any calls, and Defendant never asked for an attorney.  It is undisputed that no one from law enforcement read Defendant his *Miranda* rights at any point while they were at the Geneva Residence or in the vehicle on the way to his Chicago apartment.

### III.    Chicago Apartment

At 10:50 am on December 20, 2002, Defendant escorted law enforcement into his apartment on North Milwaukee Avenue.  Defendant fed his cat and cleaned the litter box.  He also showed Sergeant Zaglifa some of his musical equipment for mixing music.  Special Agent McDonough and Special Agent Beckerman met the other officers at the apartment.  Even though Defendant was not in custody, Agent McDonough read Defendant his *Miranda* rights shortly after they entered the apartment, and before the agents began questioning him.  The agents credibly testified that Defendant was alert and appeared to understand what they told him. Defendant signed the Miranda Advice of Rights form at approximately 11:10 am, acknowledging that he was aware of his rights and waiving them.  (Gov. Ex. 4.)  Both Agent McDonough and Sergeant Zaglifa witnessed Defendant signed the waiver.  Defendant also signed a Consent to Search for his apartment.  (Gov. Ex. 5.)  Agent Keegan witnessed him sign his consent form, which specifically noted that Defendant had been advised of his right to refuse to consent and that he gave his permission voluntarily.

Both Agent McDonough and Sergeant Zaglifa interviewed Defendant at this apartment.

Defendant never asked to speak to an attorney while the officers were at his apartment[1].

While at the apartment, Defendant also signed a Consent to Search form, which specifically gave the FBI agents consent to search the following: a Compaq Presario Laptop, a Compaq Labtop, and a Buslink External Hard Drive. The serial number for each of these items was listed on the consent form. (Gov. Ex. 6.) Agent Keegan witnessed Defendant sign this Consent to Search Form. That form did not include a micron millennia computer, although Agent McDonough searched it and found child pornography on it. Agent McDonough testified that Defendant Conrad gave oral consent to search the micron millennia. Agent McDonough further testified that he did not prepare the Consent to Search form (Agent Keegan did), thus he did not include the micron millennia on that form.

---

[1] Defendant initially claimed that he was denied his constitutional right to counsel. Although Defendant has averred in his motion that he "asked for an attorney at least twice during the interrogation at the Milwaukee Avenue apartment," (R. 96-1, at 7), at the suppression hearing, Defendant withdrew his argument that his rights were violated because he was questioned despite his requests for counsel. Defendant does not make any statements about his written waiver of his Advice of Rights.

The Court further notes that Defendant had a constitutional right to have counsel present for custodial interrogation. *Edwards v. Arizona*, 451 US 477, 482; *United States v. Fairman*, 813 F.2d 117, 125 (7th Cir. 1987). As the court addresses below, Defendant was not in custody when questioned by the agents. Furthermore, aside from the necessity of a custodial setting, Defendant must also "unambiguously request the assistance of counsel in order to invoke his right to an attorney under *Miranda* and thus prevent the interrogator from asking any further questions." *See United States v. Segal*, 207 F. Supp. 2d 835, 841 (N.D. Ill. 2002) (Castillo, J.) (citing *United States v. Muhammad*, 120 F.3d 688, 698 (7th Cir. 1997) and *Davis v. United States*, 512 U.S. 452, 458-60, 129 L. Ed. 2d 362, 114 S. Ct. 2350 (1994)). Invocation of the *Miranda* right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *Id.*; (citing *McNeil v. Wis.*, 501 U.S. 171, 178, 115 L. Ed. 2d 158, 111 S. Ct. 2204 (1991); *Edwards v. Ariz.*, 451 U.S. 477, 484-85, 68 L. Ed. 2d 378, 101 S. Ct. 1880 (1981)). The Court finds the testimony of the agents credible that Defendant never told them that he wanted an attorney. The signed Advice of Rights form corroborates that Defendant knew his rights, and agreed to proceed without an attorney present.

During the questioning, Defendant David Conrad admitted to the agents that he had engaged in the possession and transmission of child pornography. Defendant told the agents that he had operated a file server for the last year in numerous channels on the Internet relay chat and that he had child pornography on his computer. He told the agents that he had recently moved all of the child pornography images and movies off of the laptop computer onto an external hard drive. He further identified the information discovered by Sergeant Zaglifa during his undercover investigation, including the print outs Sergeant Zaglifa made during his undercover investigation into child pornography. (*See* Minute Order, R. 168-1, for a detailed account of the undercover investigation.)

After questioning Defendant, the agents left his apartment with some of the computer equipment. They did not arrest Defendant David Conrad that day.

## ANALYSIS

Defendant Conrad argues that the events of December 20 violated his Constitutional rights in three separate ways. First, Defendant argues that the law enforcement's entry into the Geneva Residence was a violation of his Fourth Amendment rights. Accordingly, Defendant asserts that the Court should suppress any evidence obtained as a result of the violation as fruit of the poisonous tree. Second, Defendant contends that his Fifth Amendment rights were violated because he was interrogated without having been given *Miranda* warnings. Finally, Defendant argues that the acts of law enforcement on December 20, 2002, amount to a coercive violation of his due process rights.

I. **Law Enforcement Improperly Entered the Curtilage at the Geneva Residence**

The Fourth Amendment provides that "the right of the people to be secure in their

persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U.S. Const. IV Amend. The Supreme Court has long recognized that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *See Payton v. New York*, 445 U.S. 573, 585 (1980). As such, "[i]t is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* (internal quotations and citations omitted). As the Supreme Court has stated: "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Id.* at 590. Furthermore, "[a] warrantless search does not violate the Fourth Amendment if a person possessing, or reasonably believed to possess, authority over the premises voluntarily consents to the search." *United States v. Groves*, 530 F.3d 506, 509 (7th Cir. 2008). The government does not contest that David Conrad had a reasonable expectation of privacy in his parent's home, where he regularly stayed.

### A. The Back Deck at the Geneva Home was Part of the Home's Curtilage

The Fourth Amendment's protections are "not limited to the four walls of one's home, but extend[] to the curtilage of the home as well." *See United States v. French*, 291 F.3d 945, 951 (7th Cir. 2002). "A warantless search of a home's curtilage implicates the 'very core' of the Fourth Amendment and presumptively is unreasonable." *Bleavins v. Bartels*, 422 F.3d 445, 451 (7th Cir. 2005) (citations omitted). "The home's curtilage encompasses the area outside the home itself but so close to and intimately connected with the home and the activities that normally go on there that it can reasonably be considered part of the home." *French*, 291 F.3d at 951 (internal citations and quotations omitted). A defendant has an expectation of privacy in the

home's curtilage.  *Id.* at 951-53.

"A curtilage line is not necessarily the property line, nor can it be located merely by measuring the distance separating the home and the area searched."  *Id.*  In order to establish that an area is part of the home's curtilage, Defendant must show that the area is "so intimately tied to the home itself that it should be placed under the home's umbrella of Fourth Amendment protection."  *United States v. Dunn*, 480 U.S. 294, 301, 94 L. Ed. 2d 326, 107 S. Ct. 1134 (1987) (internal quotations omitted); *Siebert v. Severino*, 256 F.3d 648, 653-54 (7th Cir. 2001).  Courts have found backyard areas to be within the curtilage of a home.  *See Bleavins*, 422 F.3d at 452 (backyards are "intimately connected with the . . . activities."); *Siebert v. Severino*, 256 F.3d 648, 654 (7th Cir. 2001) (holding that a barn was within curtilage); *United States v. Hedrick*, 922 F.2d 396, 399 (7th Cir. 1991) (recognizing "that the yard of a residential home is within the curtilage of the house.").  "Curtilage questions should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by."  *Dunn*, 480 U.S. at 301.  Further, curtilage questions involve fact intensive inquiries.  *Bleavins*, 422 F.3d at 449 n.1.  The Court will address each *Dunn* factor in turn.

### 1.     Proximity of the Area

First, the Court considers the proximity of the deck to the Geneva Residence.  The closer the area is to the home, the more likely an inference is raised that the area is curtilage.  *See Dunn*, 480 U.S. at 302 (barn fifty yards from fence, and sixty yards from house, "supports no inference that the barn should be treated as an adjunct of the house"); *Siebert*, 256 F.3d at 654

(locked and fenced barn with sixty feet of home was within curtilage); *Hedrick*, 922 F.2d at 399 ("garbage cans located 20 feet from the garage and approximately 50 feet from the back door of the house were technically within the curtilage of the home"). The photographic and testimonial evidence established that the rear deck in this case was directly attached to the main floor of the Conrad's home – elevated from the ground – such that the residents could walk directly onto the deck from inside the home. The deck extends approximately fourteen feet from the home, so in any circumstance an officer on the deck must be within fourteen feet of the rear of the home. Here, the agents testified that they walked on the deck and directly up to the home to look into the sliding glass doors and the windows. The photographs clearly depicted the deck directly attached to the home. Indeed, it is hard to image how the deck could have been any closer to the home. The government concedes, as it must, that the close proximity between the home and the deck supports a finding that the deck is within the home's curtilage. This fact, alone, however, is not dispositive. *Bleavins*, 422 F.3d at 451-52.

### 2.    Whether the Area is Enclosed

The Court next considers whether the area is enclosed with the home. "[F]or most homes, the boundaries of curtilage will be clearly marked." *Dunn*, 480 U.S. at 302. Such markings enable the public to determine areas that are "readily identifiable as part and parcel of the house." *Id*. at 302. Defendant's deck is encircled by a waste-high railing which effectively demarcated the curtilage even if it did not fully obscure the visibility of the rear deck. The railing fully enclosed the rear deck and marked it as a continuous part of the house. Moreover, ingress within the area was only possible by entering through a gate which was latched. Indeed, the evidence established that before entering the deck area, the agents had to open the latch on

the gate.  The existence of this enclosure supports a finding that the deck is part of the house's curtilage.

### 3. Nature of the Uses to Which the Area is Put

*Dunn* instructs the Court to next consider how the Conrads used the deck area.  "[T]he curtilage is the area that encompasses the intimate activities associated with the sanctity of the home and the privacies of life."  *French*, 291 F.3d at 951.  As an initial matter, the physical arrangement of the deck suggests that it is an extension of the home.  The deck extends out from the main floor of the home and is connected by a sliding glass door, such that family members can walk directly onto the deck from the living room and kitchen area of the home.  The deck has a grill, table and chairs on it.  Additionally, the deck is raised from the ground level, and surrounded by a waist-high fence with a gate, effectively making it appear much like an "outdoor room" of the house.  This arrangement, when combined with the furniture present on the deck, supports the conclusion that the rear deck is used for the same type of activities associated with the sanctity of the home.  Moreover, Roger Conrad testified that the family used the deck area for family activities, including eating their meals.  The physical arrangement of the deck corroborates his testimony.  This *Dunn* factor supports that the rear deck is within the curtilage of the home.

### 4. Steps Taken by the Residents to Protect the Area From the Public

The fourth *Dunn* factor involves what protections the Conrads took to protect the area from observation by the public.  Fencing which obscures visibility from the public can effectively turn an area into curtilage.  *See Bleavins,* 422 F.3d at 453-55 (rejecting that area was shielded from public as the chain link and wire fencing did not visibly obscure the area).

Although the back yard of the Geneva Residence was not enclosed with a fence, the deck itself did have such an enclosure as described in detail above. The enclosed fence contained a gate with a latch which the officers had to unhook to enter the deck area. The deck was also elevated from the ground floor in the back of the home. Moreover, there is no evidence that the back deck is an entrance point for members of the public. *Cf. United States v. Titemore*, 437 F.3d 251, 259 (2d Cir. 2006) (sliding glass door was not curtilage as it "was in fact a primary entrance visible to and used by the public"). For these reasons, the defendant has a reasonable expectation of privacy in that the public would not be on the rear deck. *Cf. Siebert*, 256 F.3d at 654 (finding a barn to be within curtilage as "[c]urious friends and neighbors, much less a government agent with a mission, would be expected to keep out."); *United States v. Karagozian*, 715 F. Supp. 1160, 1164 (D. Conn. 1989) (elevated deck in rear of house is within curtilage of the home).

The government correctly notes that the back of the Conrad home opened up to a golf course and that a fence did not separate the Geneva Residence from the course. As a result, individuals on the golf course could see the back of the Conrad home, including the back deck. The Fourth Amendment does not prohibit a police officer's naked eye observations made of a constitutionally protected area from the vantage point of a public place. *See Kyllo v. United States,* 533 U.S. 27, 32 (2001) (noting "the lawfulness of warrantless visual surveillance of a home"); *Florida v. Riley*, 488 U.S. 445, 449 (1989); *California v. Ciraolo*, 476 U.S. 207, 213 (1986) ("T]he Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares."); *see also Dunn*, 480 U.S. at 304. The fence on the deck, however, limited the visibility to some

degree.  Furthermore, while the deck was open to some level of observation from the golf course, it was not open to access.  The evidence further supports that no one on the golf course could have looked through the back windows and sliding glass door and seen inside the Geneva Residence.

Significantly, in order for the law enforcement agents to observe Defendant Conrad sleeping on the couch in this case, the agents not only had to climb the stairs and unlatch the gate, they also had look into the back bay window in order to observe Defendant.  The photographic  evidence makes clear that the agents could not have looked into that window merely from standing on the back deck.  In other words, by simply standing on the back deck, they could not have seen Defendant Conrad through the back sliding glass door or windows. Instead, given the window's location off to the left of the railing that surrounded the deck, law enforcement had to at least lean on the railing (and possibly stand, although there is no conclusive evidence on this point) in order to observe Defendant on the couch.

### 5. Weighing of Factors

Given these four factors and the reasons stated above, the Court holds that the back deck area at the Geneva Residence is part of the home's curtilage.  Accordingly, Defendant had a reasonable expectation of privacy in it, and the back deck receives the same Fourth Amendment protections as the home.

### B. The Seventh Circuit Has Not Recognized the Knock and Talk Exception

The government argues that the law enforcement officers nonetheless properly entered the deck in order to contact Defendant David Conrad.  Specifically, the government asks the Court to recognize an "exception" to warrantless searches of a home's curtilage known as the

"knock and talk" investigative tactic.  The government acknowledges that the Seventh Circuit

has not formally adopted the "knock and talk" exception, but argues that the Court should apply

it here based on the case law from other Circuits.

Although the Supreme Court declined to decide "the degree of Fourth Amendment

protection afforded the curtilage" in *Oliver*, 466 U.S. at 180, in *Dunn*, it subsequently articulated

four factors as "useful analytical tools" to determine "whether the area in question is so

intimately tired to the home itself that it should be placed under the home's 'umbrella' of Fourth

Amendment protection."  *Dunn*, 480 U.S. at 301.  Once property is curtilage, the Fourth

Amendment protections apply.  While the typical limited exceptions that apply to Fourth

Amendment searches would apply in the curtilage area – such as consent and exigent

circumstances – the Supreme Court has never recognized a "knock and talk" exception for

curtilage.

It is clear, however, that some Circuits have permitted law enforcement officers to enter a

home's curtilage without a warrant under certain circumstances.  The scope of the "knock and

talk" exceptions recognized by these Circuits, however, differs.  The Third Circuit, for example,

has held that "officers reasonably may believe, based on the facts available to them, that the

person they seek to interview may be located elsewhere on property within the curtilage . . . and,

[in such] cases, an officer's brief entry into the curtilage to test this belief might be justified."

*Estate of Smith v. Marasco,* 430 F.3d 140, 158 (3d Cir. 2005) (citation omitted).  The Eighth

Circuit has gone even further – it has held that a warrantless entry into a home's curtilage is

permissible as long as a legitimate law enforcement objective exists," and the "intrusion upon

one's privacy is limited."  *United States v. Weston*, 443 F.3d 661, 667 (8th Cir. 2006).  *See also*

*Hardesty v. Hamburg Twp.*, 461 F.3d 646, 654 (6th Cir. 2006) (holding that a police officers' entry onto protected curtilage was proper and "within the scope of the knock and talk investigative technique already recognized in this circuit"); *United States v. Hammett*, 236 F.3d 1054, 1059 (9th Cir. 2001) ("[O]fficers may encroach upon the curtilage of a home for the purpose of asking questions of the occupants."); *United States v. Taylor*, 458 F.3d 1201, 1205 (11th Cir. 2006) ("[C]ontrary to [defendant's] assertion that the government must demonstrate probable cause and exigent circumstances in order to justify the initial intrusion onto the property, the government need not do either.") (internal quotations omitted).

While the Fifth Circuit has recognized a "knock and talk" exception, it recently noted that "[i]t is true that our precedent holds that the knock and talk strategy is a 'reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity.'" *United States v. Troop*, 514 F.3d 405, 410 (5th Cir. 2008), citing *United States v. Jones,* 239 F.3d 716, 720 (5th Cir. 2001). The Fifth Circuit clarified, however, that "we have also held that when no one answers the door, the officers should end the knock and talk and "change[ ] their strategy by retreating cautiously, seeking a search warrant, or conducting further surveillance." *Id.*

As noted above, the Seventh Circuit has not adopted any version of the knock and talk exception. Nonetheless, the government urges the Court to acknowledge that the knock and talk "exception" to the Fourth Amendment analysis. It argues that the exception applies here because the evidence is clear that Roger Conrad told the agents that David Conrad was at the Geneva Residence once he learned that David Conrad's Porsche was in the drive way. In making this argument, the government asserts that curtilage is merely an application of the reasonable

expectation of privacy test for Fourth Amendment analysis. Indeed, some of the case law merges the reasonable expectation of privacy cornerstone of the Fourth Amendment with the knock and talk exception.

The government cites a line of cases involving garbage cans in support of its argument. *United States v. Shanks*, 97 F.3d 977, 978 (7th Cir. 1996) ("the mere intonation of curtilage does not end the inquiry"); *United States v. Hedrick*, 922 F.2d 396, 400 (7th Cir. 1991) (holding that "garbage within the curtilage," may be searched absent a warrant where "the garbage cans were so readily accessible to the public that they exposed the contents to the public for Fourth Amendment purposes."). In these cases, in assessing the legality of searching an individual's garbage cans, the Seventh Circuit has focused on a reasonable expectation of privacy test rather than analyzing the question of whether the garbage cans were located within the curtilage to an individual's home. Judge Posner, in a dissenting opinion in a garbage case, noted this conflict and stated that "we should adhere to the distinction between the curtilage and open fields, and permit no garbage searches, without a warrant or probable cause, within the curtilage." *United States v. Redmon*, 138 F.3d 1109, 1132 (7th Cir. 1998) (Posner, J. *dissenting*) ("Most homeowners extend an implicit invitation to social and business invitees to walk up to the front door, but in doing so the homeowner does not, as it were, 'waive curtilage.' The social and business invitee, including a police officer whether invited or uninvited, must confine himself to the prescribed route, rather than treating the invitation as one to roam the property at will, peering into the windows of the home.").

The Supreme Court's opinion in *California v. Greenwood*, 486 U.S. 35 (1988) sheds light on these cases involving the search of garbage cans that are located at various places outside of

an individual's home.  In *Greenwood*, the Supreme Court held that "having deposited their garbage in an area particularly suited for public inspection and, in a manner of speaking, public consumption, for the express purpose of having strangers take it, ... respondents could have had no reasonable expectation of privacy in the inculpatory items that they discarded."  *Id.* at 40- 41.  The Supreme Court has not, however, applied the same analysis to other curtilage issues.

The government further cites *United States v. James*, 40 F.3d 850 (7th Cir. 1994), *vacated on other grounds, James v. United States*, 516 U.S. 1022 (1995), *modified, United States v. James*, 79 F.3d 553 (7th Cir. 1996) to argue that a knock and talk exception is proper.  The Seventh Circuit in *James* held that "where the back door of a residence is readily accessible to the general public, the Fourth Amendment is not implicated when police officers approach that door in the reasonable belief that it is a principal means of access to the dwelling."  *James*, 40 F.3d at 862.  In *James,* however, the Seventh Circuit never addressed whether the "rear door" was within Fourth Amendment protected curtilage.  Moreover, it specifically noted that the officers reached the back entrance through a "paved walkway along the side of the duplex leding to the rear side door," no gate or fence impeded the "passage to the rear side door," and "[b]oth the paved walkway and the rear side door were accessible to the general public and the rear side door was commonly used for entering the duplex from the nearby alley.'  *Id.*  Given these factors, the rear door likely was not within the curtilage.  In any event, the facts surrounding the back deck at the Geneva Residence are markedly different than the facts in *Jones*.  There was no paved walkway to the back yard or back deck, a gate and a fence impeded the passage to the deck, and the back deck was not used by the public to access the home.

Based on the above case law, the Court is not willing to recognize a knock and talk

exception that has not been accepted in the Seventh Circuit.  The evidence in this case is undisputed that Roger Conrad told the law enforcement officers that David Conrad was likely at the Geneva Residence and thus the officers had reason to believe he was there.  This evidence would be sufficient to qualify for the knock and talk exception under some of the Circuit's interpretations of the exception.  Given that other Circuits have recognized an exception permitting law enforcement to enter into curtilage under certain circumstances, the Court will give the government 14 days to determine if it wants to seek an interlocutory appeal on the issue of whether the Seventh Circuit will recognize a similar exception.  *See* 18 U.S.C. § 3731; *United States v. Garcia*, 376 F.3d 648, 650 (7th Cir. 2004).  If the government elects to seek such an appeal, the Court will stay the proceedings during the pendency of that appeal.

**C.      Exigent Circumstances Did not Exist**

The government argues in a footnote, and without citing any legal authority, that "[w]ith the information they had, the officers would have been justified in entering the home to check on defendant's health" without consent to do so.  The evidence at trial made clear that an exigency argument fails on its merits in this case.

The Supreme Court has stated that a warrant is not required to enter a home where "the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment."  *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (citing *Mincey v. Arizona*, 437 U.S. 385, 393-394, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978) (internal quotations omitted).  Exigent circumstances exist when there is a compelling need for official action and no time to secure a warrant.  *United States v. Saadeh*, 61 F.3d 510, 516 (7th Cir.), *cert. denied*, 516 U.S. 990, 133 L. Ed. 2d 428, 116 S. Ct. 521 (1995)

23

(citing *Michigan v. Tyler*, 436 U.S. 499, 509, 56 L. Ed. 2d 486, 98 S. Ct. 1942 (1978)); *Marshall,* 157 F.3d at 482.  One such exigency "is the need to assist persons who are seriously injured or threatened with such injury."  *Id.*; *United States v. Jenkins*, 329 F.3d 579, 581 (7th Cir. 2003).  Indeed, "the need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency."  *Stuart*, 547 U.S. at 404-405 (citing cases).  As such, "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury."  *Id.* (citing *Mincey*, 437 U.S. at 392); *see also Georgia v. Randolph*, 547 U.S. 103, 118, 126 S. Ct. 1515, 164 L. Ed. 2d 208 (2006).

The government bears the burden of proving that the agents had an objectively reasonable belief that exigent circumstances existed at the time of the warrantless entry into the defendant's premises.  *United States v. Marshall,* 157 F.3d 477, 482 (7th Cir. 1998).  When determining whether exigent circumstances exist, the Court must analyze the situation from the perspective of the officers at the scene.  *Id.*; *Leaf v. Shelnutt*, 400 F.3d 1070, 1081 (7th Cir. 2005).  The law enforcement officers' reasons for entering the home are irrelevant, and the Court only focuses on the objective reasonableness of the entry.  *Stuart*, 547 U.S. at 404-405 ("An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify [the] action.") (internal quotations and citation omitted.).  In other words, the officers' subjective motivations are irrelevant.  *Id.*; *Bond v. United States*, 529 U.S. 334, 338, n. 2, 120 S. Ct. 1462, 146 L. Ed. 2d 365 (2000); *United States v. Richardson*, 208 F.3d 626, 629 (7th Cir. 2000) ("the test is objective: the government must establish that the circumstances as they appeared at the moment of entry would

lead a reasonable, experienced law enforcement officer to believe that someone inside the house, apartment, or hotel room required immediate assistance.") (internal quotations omitted).

At the hearing, Sergeant Zaglifa testified that he was not concerned about Defendant. Agent Keegan testified that she had some concern for Defendant when she observed him through the back window because he was on the couch and she saw an open container of pills. She also could not see his chest rising or falling. Despite this concern, she admitted that she did not call 911, she did not contact any paramedics, and she waited at least 10 minutes before entering the Geneva Residence to check on Defendant David Conrad. They waited until they had Roger Conrad's permission and a key to the home. These actions objectively do not support the government's argument that the officers reasonably feared for the safety of Defendant Conrad and believed that he was in need of immediate aid.

## II.     Fruit of the Poisonous Tree

Defendant argues that because the law enforcement agents violated his Fourth Amendment rights when they entered the curtilage, the Court should suppress any evidence obtained after that illegal entry. The Court agrees in part and disagrees in part.

The law is clear that "[a] consent to search following an illegal seizure is valid only if the evidence uncovered during the consent search has been come upon 'by means sufficiently distinguishable to be purged of the primary taint.'" *United States v. Jerez*, 108 F.3d 684, 694-95 (7th Cir. 1997) (citing *Brown v. Illinois*, 422 U.S. 590, 599, 45 L. Ed. 2d 416, 95 S. Ct. 2254 (1975) (quoting *Wong Sun v. United States*, 371 U.S. 471, 487-88, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963))). "To determine whether the acquisition of evidence pursuant to consent is purged of the taint of an antecedent illegal seizure," the Court places a "heavy burden" on the government and

looks to "(1) the temporal proximity of the ... defendant's consent; (2) the presence of intervening factors between the two events; and (3) the circumstances surrounding, and the nature of, the official misconduct." *Jerez*, 108 F.3d at 695 (7th Cir. 1997), citing *Brown*, 422 U.S. at 603-04. These factors set forth by the Supreme Court in *Brown* are critical to the Court's analysis.

In *Hudson v. Michigan*, 547 U.S. 586, 592 (2006), the Supreme Court made clear that but for causation is not sufficient to suppress evidence. Specifically, the Supreme Court noted that:

> we have never held that evidence is 'fruit of the poisonous tree simply because 'it would not have come to light but for the illegal actions of the police.' " *Segura v. United States,* 468 U.S. 796, 815, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984). *See also id.,* at 829, 104 S. Ct. 3380 (STEVENS, J., dissenting) ("We have not ... mechanically applied the [exclusionary] rule to every item of evidence that has a causal connection with police misconduct"). Rather, but-for cause, or "causation in the logical sense alone," *United States v. Ceccolini,* 435 U.S. 268, 274, 98 S. Ct. 1054, 55 L. Ed. 2d 268 (1978), can be too attenuated to justify exclusion, *id.,* at 274-275, 98 S. Ct. 1054.

*Hudson*, 547 U.S. at 592. "Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " *Id.*, quoting *Wong Sun v. United States,* 371 U.S. 471, 487-488, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963) (quoting J. Maguire, Evidence of Guilt 221 (1959) (emphasis added)).

Here, the evidence is clear that after improperly entering the curtilage, the law enforcement agents peered through a bay window off the side of the deck. At that point, they observed Defendant David Conrad on the couch. Although the parties disagree on precisely what information Agent McDonough conveyed to Roger Conrad after this observation, the evidence is undisputed that Roger Conrad consented to the law enforcement officers entering the

26

Geneva Residence only after the officers provided him with this information obtained from their observation while on the curtilage.

## A. Evidence from the Geneva Residence

The first inquiry for the taint analysis is the temporal proximity of obtaining the evidence at the Geneva Residence with the curtilage violation. It is undisputed that Defendant's incriminating statements at the Geneva Residence were temporally proximate to the curtilage violation. Once the law enforcement officers entered the Geneva Residence, they gave Defendant a few moments to wake up and become alert, but immediately questioned him after those minutes passed.

The second question is the presence of intervening factors between the two events. The government argues that any evidence obtained at the Geneva Residence, including Defendant's statements, is not tainted because "it was the discovery of defendant's apparent distress that served as an intervening circumstance between the entry on the deck and the entry into the home with Roger Conrad's consent." (Post-Hearing Response, R. 170 at 12.) The Court disagrees.

The Seventh Circuit addressed "intervening events" in detail *United States v. Reed*, 349 F.3d 457 (7th Cir. 2003):

> The type of intervening events that serve to attenuate official misconduct are those that sever the causal connection between the illegal arrest and the discovery of the evidence. *See Wong Sun,* 371 U.S. at 491, 83 S. Ct. 407 (confession was made several days after illegal arrest and was preceded by arraignment and release from custody); *Rawlings,* 448 U.S. at 108-09, 100 S. Ct. 2556 (discovery of other incriminating evidence implicating the defendant and causing the defendant to confess spontaneously); *Fazio,* 914 F.2d at 958 & n. 12 (defendant freely agreed to speak to police at site away from scene of illegal arrest and drove his own vehicle to the meeting); *United States v. Green,* 111 F.3d 515, 521 (7th Cir. 1997) (proper arrest on unrelated charges following initial illegal arrest); *United States v. Delgadillo-Velasquez,* 856 F.2d 1292, 1300 (9th Cir. 1988) (defendant's subsequent release from custody, appearance before magistrate judge, discussions with counsel, or subsequent convictions on unrelated charges). Under the circumstances of

this case, the non-confrontational interviews between Reed and the police and Reed's periods of solitary reflection did not constitute significant intervening events suggesting that his subsequent confession was attenuated from his unlawful arrest.

*Reed*, 349 F.3d at 464.

Here, the agents' observations of Defendant David Conrad were not an intervening circumstance, but rather were a direct result of the curtilage violation. Roger Conrad's consent immediately followed the curtilage violation and was a direct result of information obtained from the curtilage violation. Indeed, the government does not dispute that Roger Conrad gave consent to enter the Geneva Residence only after law enforcement informed him that his son's health was in question. Because Roger Conrad's consent was based solely on information obtained by the agents' during the curtilage violation and no intervening circumstances occurred, the evidence obtained once inside the Geneva Residence is not sufficiently distinguishable to be purged of the primary taint. Illegal entry into the curilage tainted the consent.

The final inquiry is the nature of the agent's conduct. This inquiry "is considered the most important because it is tied directly to the rationale underlying the exclusionary rule, deterrence of police misconduct." *Reed*, 349 F.3d at 464-65. The government contends that the law enforcement agents' conduct at the Geneva Residence "was not the sort of purposeful, flagrant violation sought to be prevented by the suppression of evidence" because the agents did not use illegally obtained evidence to enter the Geneva Residence. As noted above, however, the agents would not have seen Defendant through the window and subsequently obtained Roger Conrad's consent to enter the Geneva Residence if they had not entered the curtilage. The Court agrees that once inside the Geneva Residence, the agents were professional and courteous to Defendant. The Seventh Circuit has made clear, however, that "in addition to examining

whether the officer's actions were coercive or calculated to cause surprise, fright or confusion, the district court also must examine whether the actions were undertaken in an effort to advance the investigation or to embark on a fishing expedition in the hopes that it would lead to a confession or other useful evidence. Such actions would undermine the purpose of the Fourth Amendment, and therefore are relevant to this analysis that ultimately examines whether suppression is necessary for purposes of deterrence or judicial integrity. Because that determination involves issues of fact as well as law, they are more properly addressed by the district court in the first instance." *Reed*, 349 F.3d at 465-66.

The record is clear that the agents were investigating child pornography associated with an IP address that was assigned to Roger's Machinery – Richard Conrad's business. The agents executed a search warrant at the business, but did not obtain any evidence of child pornography. They suspected that Defendant David Conrad – whom they learned had access to Roger's Machinery's DSL account that used the IP address in question – was possessing and transporting child pornography, and thus they wanted to talk to him. Roger Conrad confirmed for the agents that David Conrad was at the Geneva Residence. The agents acknowledged that they were at the Geneva Residence on December 20 because they wanted to talk to David Conrad. When he did not answer the door or telephone after two hours of waiting, the law enforcement agents proceeded to the curtilage. The law enforcement agents wanted to advance their investigation when they entered the curtilage and home at the Geneva Residence. This factor weighs in favor of suppressing the evidence obtained at the Geneva Residence, including Defendant's admissions.

Given these three factors, the Court cannot conclude that the "causal connection between

[the] illegal conduct and the procurement of the [evidence] is 'so attenuated as to dissipate the taint' of the illegal action." *United States v. Fields*, 371 F.3d 910, 915 (7th Cir. 2004) (quoting *United States v. Green*, 111 F.3d 515, 521 (7th Cir. 1997). The government has not met it burden of establishing a sufficient break in events between the constitutional violation and the confession at the Geneva Residence. Accordingly, the Court suppresses the evidence obtained at the Geneva Residence on December 20, 2002, and any statements Defendant made on the car ride to his Chicago apartment.

### B. Evidence from Defendant's Chicago Apartment

After questioning Defendant at the Geneva Residence, Defendant agreed to go downtown to his Chicago apartment with the law enforcement officers. In fact, Defendant voluntarily told the law enforcement officers that he had an apartment in Chicago. While at the Chicago apartment, the agents obtained additional evidence, including a lengthy confession.

As noted above, the Court is suppressing Defendant's statements at the Geneva Residence, including that he had child pornography stored on a computer at his Chicago apartment and that he agreed to accompany the agents to the computer. Although this statement led to the agents ultimately going to Defendant's Chicago apartment, this fact alone does not result in suppression of the evidence from the Chicago apartment because the Supreme Court has made clear that "but for" causation is not sufficient to suppress evidence. *Hudson,* 547 U.S. at 592. The Court must analyze the *Brown* factors to determine whether the agents obtained the evidence from the Chicago apartment by means sufficiently distinguishable to purged it of the primary taint from the Fourth Amendment violation.

Before turning to the three *Brown* factors, the Court must first address the voluntariness

of Defendant's confession. *United States v. Fazio*, 914 F.2d 950, 957 (7th Cir. 1990) ("voluntariness of the statement is a threshold requirement"). "A confession is voluntary if, in the totality of the circumstances, it is the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." *United States v. Ross,* 510 F.3d 702, 709 (7th Cir. 2007), quoting *United States v. Huerta,* 239 F.3d 865, 871 (7th Cir. 2001) (internal quotation marks and citations omitted). *See also United States v. LeShore*, __ F.3d __, 2008 WL 4173086 at * 4, (7th Cir. Sept. 11, 2008). In assessing the voluntariness of a confession, courts look to certain factors, including "the defendant's age, intelligence, education, mental state; whether he was given his *Miranda* rights; the duration and environment of the interrogation, including the suspect's access to the restroom and food during the interrogation; and the conduct of law enforcement." *Ross*, 510 F.3d at 709, citing *Conner v. McBride,* 375 F.3d 643, 651 (7th Cir.2004). *See also United States v. Biggs*, 491 F.3d 616, 622 (7th Cir. 2007).

The Court holds that looking at the totality of the circumstances, Defendant's confession at the Chicago apartment was voluntary. Defendant was [22] years old and intelligent. The testimony from Agent Keegan and Sergeant Zaglifa and McDonough, as well as the signed Miranda form, established that the Agents advised Defendant of his Constitutional rights and he agreed to waive them and go forward with the questioning, even though Defendant was not in custody at the time. Agent McDonough advised Defendant of his *Miranda* rights almost immediately after they arrived at his Chicago apartment, and he willingly agreed to waive them. The officers did not have to repeatedly ask for his consent – Defendant David Conrad agreed immediately. Furthermore, there is no evidence of any physical coercion. To the contrary, the

officers all testified that Defendant was cooperative and the questioning took place in a professional manner. For all of these reasons, Defendant voluntarily confessed to the law enforcement agents. This issue, however, is not dispositive. The Court turns to the three *Brown* factors.

Looking at the temporal proximity factor, the officers arrived approximately two hours after they improperly entered the curtilage. Defendant remained in their presence during this entire time period. The Seventh Circuit has made clear that there is "no bright-line test for temporal proximity." *United States v. Reed*, 349 F.3d 457, 463 (7th Cir. 2003). *See Rawlings v. Kentucky*, 448 U.S. 98, 107-08 (1980) (taint purged for confession made 45 minutes after constitutional violation).

Second, the intervening factors support that the taint from the curtilage violation was purged when the agents obtained the evidence from the Chicago apartment. One such intervening factor was Defendant's written waiver of his *Miranda* rights. Shortly after entering the Chicago apartment, Agent McDonough read Defendant his rights, and Defendant willingly signed a waiver of those rights. The law is clear, however, that *Miranda* warnings and waivers alone are not sufficient to purge the taint of a constitutional violation because *Miranda* addresses whether law enforcement violated a defendant's Fifth Amendment rights. "The exclusionary rule, when used to effectuate the Fourth Amendment, serves interests and policies distinct from those it serves under the Fifth Amendment." *United States v. Reed*, 349 F.3d 457 (7th Cir. 2003). In addition to waiving his rights (even though Defendant was not in custody), Defendant also signed a consent to search his apartment and a consent to search two computers and a hard drive.

Moreover, Defendant's confession and the seizure of the computers at the Chicago apartment took place at a different location than the curtilage violation, and almost two hours after the violation. The Fourth Amendment violation took place at Defendant's parents' home in Geneva, Illinois, a location where Defendant was undoubtedly comfortable. Yet, Defendant willingly left that location to take the officers to his apartment in Chicago. Additionally, Defendant volunteered the existence of the evidence at the Chicago apartment – Agent Keegan and Sergeant Zaglifa were not aware of it.

Finally, the agents' conduct was professional. While in the vehicle on his way downtown, Defendant called his father, Roger Conrad, on Defendant's cell phone. There is no evidence that Defendant complained to his dad or anyone else about the agents' conduct. The agents credibly testified that they treated Defendant in a professional manner. Further, given that Defendant volunteered to the agents that he had another computer at a Chicago apartment that contained child pornography, the Court would be hard-pressed to conclude that the agents went to the apartment on a fishing expedition. While the agents certainly wanted the evidence to assist in their investigation into child pornography, given the other *Brown* factors, the Court does not conclude that the agents' conduct should result in suppression of the evidence. The Court finds that the evidence obtained from the Chicago apartment – including Defendant's confession – was obtained "by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun*, 371 U.S. at 488.

## III.    Consent to Search

### A.    Roger Conrad's Consent to Search

Defendant also argues that Roger Conrad did not voluntarily consent to the search of the

Geneva Residence[2]. While the Fourth Amendment safeguards an individual's right to be free from warrantless intrusions into his home, *see Payton*, 445 U.S. at 589-90, an exception to the warrant requirement permits authorities to enter a dwelling without a warrant if they obtain voluntary consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973); *United States v. Biggs,* 491 F.3d 616, 622 (7th Cir. 2007); *United States v. Dickerson*, 975 F.2d 1245, 1249 (7th Cir. 1992); *United States v. Rosario*, 962 F.2d 733, 736 (7th Cir. 1992). When the government seeks to rely on consent to justify a warrantless entry or search, it must prove by a preponderance of the evidence that "the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied." *Schneckloth*, 412 U.S. at 248; *Dickerson*, 975 F.2d 1245, 1249; *see also United States v. Groves*, 470 F.3d 311, 321 (7th Cir. 2006) (citing *Bustamonte*, 412 U.S. at 248); *Rosario*, 962 F.2d at 738 ("The government must prove by a preponderance of the evidence that someone who consents to a search does so freely and voluntarily."). The parties do not dispute that Roger Conrad was the owner of the Geneva Residence and was capable of giving officers permission to enter his home. *See United States v. Melgar*, 227 F.3d 1038, 1041 (7th Cir. 2000). Nor do the parties dispute that Roger Conrad actually gave law enforcement consent to enter the Geneva Residence. They do dispute, however, whether Roger Conrad gave his consent voluntarily.

As noted above, the following factors are relevant to determining whether consent was voluntary: (1) the age, education and intelligence of the individual; (2) whether the individual was advised of his constitutional rights; (3) the length of detention prior to consent; (4) whether

---

[2] The Court will address this argument in the interests of completeness, even though the curtilage ruling makes it moot.

the indivdiual consented immediately or police made repeated requests for consent; (5) whether physical coercion was used; (6) whether the individual was in custody. *United States v. Biggs*, 491 F.3d 616, 622 (7th Cir. 2007). Courts also consider "the possibly vulnerable subjective state of the person who consents" in the voluntariness analysis. *Bustamonte*, 412 U.S. at 229. While the police are allowed to play on a suspect's ignorance, his anxieties, his fears, and his uncertainties; they are not allowed to magnify those fears and uncertainties to the point where rational decision becomes impossible. *United States v. Rutledge*, 900 F.2d 1127, 1130 (7th Cir. 1990). Moreover, "[t]rickery, fraud, or misrepresentation on the part of the police to gain entry naturally undermines the voluntariness of any consent." *United States v. Griffin*, 530 F.2d 739, 743 (7th Cir. 1976).

The Seventh Circuit has held that "[b]aseless threats to obtain a search warrant may render consent involuntary." *United States v. White*, 979 F.2d 539, 542 (7th Cir. 1992); *United States v. Bolin*, 514 F.2d 554, 560 (7th Cir. 1975); *see also United States v. Groves*, 470 F.3d 311, 322 (7th Cir. 2006) (noting that "[a]ny level of threats or coercion related to [Defendant's] child would weigh against a finding of voluntariness."). The Court thus determines whether the threat was baseless. *See, e.g.*, *United States v. Evans*, 27 F.3d 1219, 1231 (7th Cir. 1994) (analyzing legitimacy of officers' expressed intention to obtain a search warrant). Here, it was only after the agents told Roger Conrad that his son's health was at risk that he consented to their entry into the Geneva Residence. In conveying the then known facts to Roger Conrad, Agent McDonough admits that he mistakenly informed Roger that the bottle of pills was located on a table next to where his son was sleeping, not on the kitchen counter. Roger Conrad also contends that he was told by that the agents would "break down the door" to save Defendant's

life if Roger did not give them permission to enter. Defendant contends, in essence, that the agent's threats were baseless because the agents did not really believe that David's life was in jeopardy.

Roger Conrad's consent was voluntary under the totality of the circumstances. While the circumstances did not rise to exigency, the agents credibly testified that they had concerns for David Conrad's health. Indeed, they had rung the doorbell at the Geneva Residence and phoned the residence on and off for two hours – and Defendant never responded. They climbed up the back wooden stairs of the deck and Defendant did not awaken. They walked around on the deck and there is no evidence that Defendant – who was on a couch near the deck – heard them. An open pill bottle was on the kitchen counter – in the general vicinity of Defendant. These factors support that the agents had some concerns about Defendant's health when he did not respond.

Roger Conrad's consent to enter the Geneva Residence was nonetheless limited in scope. The scope of a search generally is characterized by its expressed object. *United States v. Saadeh*, 61 F.3d 510, 518 (7th Cir. 1995). The Court applies a standard of "objective reasonableness," asking how a reasonable person would have understood the conversation between the law enforcement officer and the criminal suspect. *Id.* Roger Conrad previously had denied the agents' requests to enter his home but then granted them permission to do so when he learned that his son's life was potentially at risk. His permission to enter was limited to checking on Defendant's health.

**B.      Defendant's Consent at the Geneva Residence**

Once inside the Geneva Residence, the law enforcement officers did not search the home, other than the bathroom area for safety reasons before Defendant used it. Looking at the totality

of the circumstances, Defendant David Conrad voluntarily consented to speaking with Agent Keegan and Sergeant Zaglifa. The agents entered the Geneva Residence, woke Defendant and informed them of their identities, gave Defendant time to become alert, waited until he was alert, and then asked him some questions. Defendant was immediately cooperative. There is no evidence that the officers used any physical coercion. To the contrary, the evidence supports that the agents were professional and gave Defendant the option to talk to them. Defendant even volunteered that one of his computers that contained child pornography was outside in his Porsche, and Defendant voluntarily went out to the vehicle to retrieve it. Defendant voluntarily consented to the agent's presence in the Geneva Residence.

## IV.    Unlawful Seizure in Violation of Fourth Amendment

Defendant Conrad also argues that he was illegally seized in violation of the Fourth Amendment by the officers at both the Geneva Residence and his Chicago apartment. If a statement is obtained through exploitation of an improper seizure, it must be suppressed. *See A.M. v. Butler*, 360 F.3d 787, 798 (7th Cir. 2004) (citing *Brown v. Illinois*, 422 U.S. 590, 604, 45 L. Ed. 2d 416, 95 S. Ct. 2254 (1975) and *Dunaway v. New York*, 442 U.S. 200, 217, 60 L. Ed. 2d 824, 99 S. Ct. 2248 (1979). The government argues that Defendant Conrad was never seized. Notably, the government does not argue that either probable cause or reasonable suspicion existed at the time of the alleged seizure. Thus, the government concedes that if Defendant Conrad was seized while at the Geneva Residence, that seizure violated the Fourth Amendment.

In determining whether a person was seized, the Court must determine "whether a reasonable person, innocent of any crime, would have concluded that he was not free to leave police custody." *Id.*; *see also Brendlin v. California*, 127 S. Ct. 2400, 2406 (2007) (the test is

whether a reasonable person in Defendant's position "would have believed himself free to 'terminate the encounter' between the police and himself."). Similarly, where leaving is otherwise impractical, "the appropriate inquiry is whether a reasonable person would feel free to decline the officers' request or otherwise terminate the encounter." *United States v. Adeyeye*, 359 F.3d 457, 461 (7th Cir. 2004) (quoting *Florida v. Bostick*, 501 U.S. 429, 436, 115 L. Ed. 2d 389, 111 S. Ct. 2382 (1991)); *see also Terry v. Richardson,* 346 F.3d 781, 785 (7th Cir. 2003); *United States v. Drayton*, 536 U.S. 194, 153 L. Ed. 2d 242, 122 S. Ct. 2105 (2002); *Jerez*, 108 F.3d at 689. When determining whether a person has been 'seized' within the meaning of the Fourth Amendment, the Court must view all of the circumstances surrounding the incident. *See*, *e.g., United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *Deluna v. City of Rockford*, 447 F.3d 1008, 1014 (7th Cir. 2006). "Determining whether a seizure has occurred is a highly fact-bound inquiry, but the following are relevant factors: whether the encounter took place in a public place or whether police removed the person to another location; whether the police told the person he was not under arrest and was free to leave; whether the police informed the person that he was suspected of a crime or the target of an investigation; whether the person was deprived of identification or other documents without which he could not leave (such as a driver's license or train or airline ticket); and whether there was any limitation of the person's movement such as physical touching, display of a weapon, or other coercive conduct on the part of the police that indicates cooperation is required." *United States v. Tyler*, 512 F.3d 405, 410 (7th Cir. 2008).

As discussed above, the agents did not restrain Defendant's movements, they did not threaten him, they did not coerce him, and they specifically told him that he was not under arrest.

The Court thus rejects Defendant's argument that he was seized in violation of the Fourth Amendment.

## V. The Government Did Not Violate Defendant's *Miranda* Rights

Under *Miranda v. Arizona*, 384 U.S. 436 (1966), a suspect interrogated by law enforcement officers while in custody must be notified of his constitutional rights to counsel and against self-incrimination. *United States v. Hendrix*, 509 F.3d 362, 373 (7th Cir. 2007). Stated differently, *Miranda* warnings are only triggered if the interviewee is both in custody and subject to interrogation. *United States v. Thompson*, 496 F.3d 807, 810 (7th Cir. 2007); *United States v. Barker*, 467 F.3d 625, 628 (7th Cir. 2006). There is no dispute that Defendant was interrogated by law enforcement throughout the day of December 20. The threshold question is whether he was in custody. The Court holds that Defendant was not in custody at the Geneva Residence or at the Chicago apartment.

### A. Custody

A suspect is "in custody" for *Miranda* purposes when there is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Thompson*, 496 F.3d at 811 (citing *Barker*, 467 F.3d at 628 (quoting *Miranda*, 384 U.S. at 444)). Custody implies a situation in which the suspect does not feel free to end the conversation. *Id.* And "the essential element of a custodial interrogation is coercion." *Id.* (citing cases).

The inquiry into whether a suspect is in custody is objective, and the Court looks to the totality of the circumstances and considers whether a reasonable person would have believed that he or she was free to leave. *Id.* (citing cases). As such, the Court does not consider the

subjective views harbored by either the officers or the suspect.  *See Stansbury v. Cal*., 511 U.S. 318, 323-24 (1994) ("It is well settled, then, that a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of Miranda.").  The Seventh Circuit instructs district courts to consider such factors as "whether the encounter occurred in a public place; whether the suspect consented to speak with the officers; whether the officers informed the individual that he was not under arrest and was free to leave; whether the individual was moved to another area; whether there was a threatening presence of several officers and a display of weapons or physical force; and whether the officers' tone of voice was such that their requests were likely to be obeyed."  *Thompson*, 496 F.3d at 811.

Here, considering the totality of the circumstances, a reasonable person would not have believed that he was in custody at the Geneva Residence.  The agents credibly testified that they told Defendant he was not under arrest and that he was free to leave.  No credible evidence refutes this fact.  Further, Defendant left the residence to go to his vehicle to obtain his laptop. The officers never threatened Defendant nor used physical coercion.

Similarly, Defendant was not in custody when he accompanied the officers in their vehicle to his Chicago apartment.  The agents credibly testified that Defendant volunteered the existence of his Chicago apartment and the fact that he had child pornography on his computer at the laptop.  He willingly agreed to accompany them.  They did not restrain him.  Defendant even used his cell phone while in the vehicle to call his father.  In *United States v. Wyatt*, 179 F.3d 532, 537 (7th Cir. 1999), the Seventh Circuit found that Defendant was not "in custody" for *Miranda* purposes where police officers asked the defendant if he would accompany them to the

40

police station, and then conveyed the defendant to the station in a squad car uncuffed after he agreed to go. *See also United States v. Jones*, 21 F.3d 165, 170 (7th Cir. 1994) (transporting suspect four miles to police headquarters in squad car did not render interrogation custodial). Notably, in *Jones* the police officers drove the defendant's van while Defendant was transported in a squad car. *Id. See also United States v. Scheets*, 188 F.3d 829, 842 (7th Cir. 1999) (no custody after prolonged encounter in which suspect was told that he was not permitted to drive his car because he was too intoxicated).

Further, the agents did not place Defendant in custody at his apartment. The agent credibly testified that he did not place Defendant in custody at the apartment. Defendant's movements were not restricted within his Chicago apartment, the agents did not use any force or the threat of force at the Chicago apartment, they did not handcuff Defendant, and Defendant remained free to leave.

### B. Voluntariness of Waiver

The government contends that even if Defendant was in custody at his apartment, he voluntarily waived his *Miranda* rights. The Court agrees. A voluntary relinquishment of a right occurs when a waiver is the "product of a free and deliberate choice rather than intimidation, coercion, or deception." *A.M. v. Butler*, 360 F.3d 787, 799 (7th Cir. 2004) (citing *Moran v. Burbine*, 475 U.S. 412, 421, 89 L. Ed. 2d 410, 106 S. Ct. 1135 (1986)). In evaluating voluntariness, the Court examines the totality of the circumstances. *Id.* (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973)). As discussed above, Defendant voluntarily waived his rights at the Chicago apartment.

**CONCLUSION**

Defendant's motion to suppress is granted in part. Because the law enforcement agents violated Defendant's Fourth Amendment rights when they entered the curtilage at the Geneva Residence, the evidence they obtained at the Geneva Residence is suppressed. The rest of Defendant's motion is denied for the reasons stated above.

Dated:  September 24, 2008                    ENTERED:

                                             _____
                                             AMY J. ST. EVE
                                             United States District Court Judge