**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 05 CR 931 |
| | ) | |
| DAVID CONRAD, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

Before the Court is Defendant David Conrad's Motion to Disregard Previously Suppressed Evidence Presented at Second Suppression Hearing and to Suppress Exhibit 80 ("Motion"). For the reasons below, the Court denies the Motion and finds that Exhibit 81 is the laptop computer subject to the Court's earlier suppression ruling.

**BACKGROUND**

On November 16, 2005, the Government filed an information against David Conrad. On January 23, 2007, a federal grand jury returned a Superseding Indictment ("Indictment") charging Defendant David Conrad with eight counts of possessing, transporting, advertising, and distributing child pornography in violation of 18 U.S.C. §§ 2251(c)(1)(A), 2251(d), 2252A(a)(2)(A), 2252A(a)(1), 2252A(a)(5)(B), 2252A(b)(1), and 2252A(b)(2).

Law enforcement agents obtained some of the evidence supporting the Indictment on December 20, 2002, from both the Conrad family residence, located in Geneva, Illinois ("the Geneva Residence"), and Defendant's Chicago, Illinois apartment ("the Chicago Apartment"). That evidence includes two Compaq laptop computers, one with serial number V708BMS29179

(identified during these proceedings as "Exhibit 81") and one with serial number 6D1CJCH1J0MJ (identified during these proceedings as "Exhibit 80"). The agents recovered one laptop from the Geneva Residence and one from the Chicago Apartment. Law enforcement agents, however, did not contemporaneously record which laptop computer was obtained from the Geneva Residence and which was obtained from the Chicago Apartment. The Government's initial examination did not reveal any relevant evidence on Exhibit 80.

On September 24, 2008, following a three-day suppression hearing, the Court suppressed certain evidence that law enforcement agents had obtained at the Geneva Residence on December 20, 2002, including a laptop computer Defendant had retrieved from his Porsche. *See United States v. Conrad*, 578 F. Supp. 2d 1016, 1036 (N.D. Ill. 2008). The evidence was suppressed because law enforcement agents violated Defendant's Fourth Amendment rights when they entered the curtilage at the Geneva Residence. The Court declined to suppress evidence obtained from the Chicago Apartment, including another laptop computer. *Id.* at 1038.

Following the suppression ruling, the Government applied for a warrant to re-search Exhibit 80, among other items. Magistrate Judge Keys issued the search warrant on May 14, 2009, and the Government subsequently found relevant evidence on Exhibit 80. After the Government informed Defendant on June 23, 2009, that it had searched Exhibit 80 pursuant to the search warrant and found relevant evidence on it, Defendant filed this Motion.

The Court held another suppression hearing on July 13 and 16, 2009, to address the merits of Defendant's Motion, to determine which laptop computer came from which location and, accordingly, to decide which laptop is subject to the Court's earlier suppression ruling. In making that determination, Defendant asks the Court to disregard evidence obtained from the

2

Geneva Residence, including the laptop obtained there and Defendant's statement that he may have some child pornography on an old laptop in his car.

## RELEVANT FACTS

In light of the lengthy suppression ruling the Court has already issued, the Court assumes the parties' familiarity with the facts of this case. As relevant here, three witnesses testified during the July 2009 hearing: (1) FBI Special Agent Scott McDonough, (2) FBI Special Agent Tracie Keegan, and (3) Palos Heights Police Department Sergeant Michael Zaglifa. Defendant did not call any witnesses or introduce any evidence. During the hearing, the Court closely observed each witness who testified and evaluated the credibility and demeanor of each witness. The Court also considered, among other things, Exhibits 80, 81, and 85, an affidavit from Hewlett Packard ("HP Affidavit"). The following factual findings are based on the evidence presented at the suppression hearing.

Agent Keegan and Sergeant Zaglifa were present with Defendant David Conrad at the Geneva Residence on the morning of December 20, 2002. (July 13, 2009 Tr. at 80:16-81:3; July 16, 2009 Tr. at 2:5-16.) Before Defendant Conrad left the Geneva Residence for the Chicago Apartment, he told Agent Keegan and Sergeant Zaglifa that he thought he might have some child pornography on an old laptop in his car. (July 13, 2009 Tr. at 82:8-16; July 16, 2009 Tr. at 4:5-7.) Agent Keegan and Sergeant Zaglifa then went with Defendant to his Porsche, where Defendant retrieved a laptop and gave it to Sergeant Zaglifa. (July 13, 2009 Tr. at 82:17-83:2; July 16, 2009 Tr. at 4:5-16.) Sergeant Zaglifa then commented that Defendant was not joking when he said the laptop was old, and Defendant laughed. (July 16, 2009 Tr. at 4:20-5:2.)

Sergeant Zaglifa identified Exhibit 81 as the laptop that Defendant Conrad handed him at

the Geneva Residence, and he testified that a different laptop he subsequently saw at the Chicago Apartment was newer than Exhibit 81. (*Id.* at 5:3-6:5.) Agent Keegan testified that she could not specifically identify the laptop that Defendant had handed to Sergeant Zaglifa at the Geneva Residence. (July 13, 2009 Tr. at 82:17-83:8.) She did testify, however, that the laptop obtained from Defendant's Porsche was old and that it was not Exhibit 80, which she said was newer than the laptop from the Porsche. (*Id.* at 83:5-10, 84:22-85:5.) Exhibit 80 was manufactured in 1997, and Exhibit 81 was manufactured five years later. (HP Affidavit at ¶¶ 9, 10.)

Agent McDonough was one of several law enforcement agents at the Chicago Apartment on December 20, 2002. Before he, Defendant Conrad, or any other law enforcement agent entered the Chicago Apartment, Agent McDonough observed an older brown laptop computer outside the Chicago Apartment. (July 13, 2009 Tr. at 7:14-8:3.) Agent McDonough also recalled Agent Keegan telling him that law enforcement had recovered an old laptop from the Porsche at the Geneva Residence. (*Id.* at 6:21-24.) After Agent McDonough entered the Chicago Apartment, Defendant gave a statement to Agent McDonough and Sergeant Zaglifa, in which Defendant told them about a new laptop computer in the Chicago Apartment, which Defendant said he used as his primary laptop to operate his file server. (*Id.* at 8:4-9:14.) Defendant also told Agent McDonough and Sergeant Zaglifa that he recently transferred all video and image files of child pornography from the newer laptop to an external hard drive that was also located in the Chicago Apartment. (*Id.* at 9:8-14.) Exhibit 80 has two UBS ports, which can be used to connect with the external hard drive obtained at the Chicago Apartment. (*Id.* at 19:10-17.) Exhibit 81 does not have a USB port and cannot be connected with the external hard drive. (*Id.* at 19:18-20:8.)

Agent McDonough observed Exhibit 80 at the Chicago Apartment, and he identified it as the laptop obtained there, based on its newness, silver and gray-blue color around the edge, and circle on the top that says "Compaq." (*Id.* at 12:16-13:3, 16:9-16.) Additionally, Agent McDonough identified Exhibit 81 as the old laptop that Agent Keegan and Detective Zaglifa brought to the Chicago Apartment, based on its old age, thick monitor, color, and black-and-white sticker that says "Empire" on it. (*Id.* at 13:18-14:4, 16:17-17:4.)

## ANALYSIS

Defendant Conrad argues that Exhibits 80 and 81 should be suppressed and that, in considering his Motion, the Court must disregard all evidence obtained from the Geneva Residence, which the Court previously suppressed. The Government carries the burden of proof here. "As a general matter, 'the controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.'" *United States v. Gillespie*, 974 F.2d 796, 800 (7th Cir. 1992) (quoting *United States v. Matlock*, 415 U.S. 164, 178 n.14, 94 S.Ct. 988, 996 (1974)).

**I.   The Court Can Consider Previously Suppressed Evidence in Determining Whether Exhibit 80 Was Obtained at the Geneva Residence**

The Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The purpose of the Fourth Amendment is to prevent unreasonable governmental intrusions into the privacy of one's person, house, papers, or effects." *United States v. Calandra*, 414 U.S. 338, 354, 94 S.Ct. 613, 623 (1974). However, "[t]he Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands, and an examination of its origin and purposes makes clear that the use of fruits of a past unlawful search

5

or seizure 'works no new Fourth Amendment wrong.'" *United States v. Leon*, 468 U.S. 897, 906, 104 S.Ct. 3405, 3411 (1984) (quoting *Calandra*, 414 U.S. at 354, 94 S.Ct. at 623). Indeed, "a Fourth Amendment violation is fully accomplished by the illegal search or seizure, and no exclusion of evidence from a judicial or administrative proceeding can cure the invasion of the defendant's rights which he has already suffered." *Pennsylvania Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 362, 118 S.Ct. 2014, 2019 (1998) (internal quotation omitted).

A. **The Exclusionary Rule**

The exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *Calandra*, 414 U.S. at 348, 94 S.Ct. at 620. "Despite its broad deterrent purpose, the exclusionary rule has never been interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons." *Id.* at 348, 94 S.Ct. at 620. In fact, the Supreme Court has "repeatedly declined to extend the exclusionary rule to proceedings other than criminal trials."[1] *Scott*, 524 U.S. at 363, 118 S.Ct. at 2019. *See also Leon*, 468 U.S. at 909, 104 S.Ct. at 3413 ("Proposed extensions of the exclusionary rule to

---

[1] Even in the context of criminal trials, the Supreme Court has declined to extend the exclusionary rule to numerous circumstances. *See Illinois v. Krull*, 480 U.S. 340, 349-50, 107 S.Ct. 1160, 1166-67 (1987) (where a law enforcement agent relies on a statute later ruled to be unconstitutional); *Leon*, 468 U.S. at 922, 104 S.Ct. at 3420 (where a law enforcement agent reasonably relies in good faith on a search warrant subsequently deemed invalid); *United States v. Havens*, 446 U.S. 620, 627-28, 100 S.Ct. 1912, 1916-17 (1980) (where the illegally-obtained evidence is used to impeach the defendant's testimony). Additionally, the Seventh Circuit has declined to extend the exclusionary rule to police officers' failure to abide by the knock and announce requirement in executing a search warrant, *United States v. Espinoza*, 256 F.3d 718, 729 (7th Cir. 2001), and to law enforcement's seizure of evidence through a warrant that does not satisfy the Fourth Amendment's particularity requirement, *United States v. Stefonek*, 179 F.3d 1030, 1035-36 (7th Cir. 1999).

proceedings other than the criminal trial itself have been evaluated and rejected. . . ."). Accordingly, "exclusion is appropriate only if the remedial objectives of the rule are thought most efficaciously served." *Arizona v. Evans*, 514 U.S. 1, 13-14, 115 S.Ct. 1185, 1193 (1995).

In deciding whether to apply the exclusionary rule to a given situation, courts use a balancing test, weighing the costs and benefits of its application.[2] *Illinois v. Krull*, 480 U.S. 340, 347, 107 S.Ct. 1160, 1166 (1987); *Stone v. Powell*, 428 U.S. 465, 488, 96 S.Ct. 3037, 3049 (1976); *Calandra*, 414 U.S. at 348, 94 S.Ct. at 620; *United States v. Brimah*, 214 F.3d 854, 857 (7th Cir. 2000). Specifically, the exclusionary rule is "applicable only where its deterrence benefits outweigh its 'substantial social costs.'" *Scott*, 524 U.S. at 363, 118 S.Ct. at 2019 (quoting *Leon*, 468 U.S. at 907, 104 S.Ct. at 3412).

The main purpose of the exclusionary rule, "if not the sole one, is to deter future unlawful police conduct."[3] *United States v. Janis*, 428 U.S. 433, 446, 96 S.Ct. 3021, 3028 (1976) (internal

---

[2] *Silverthorne Lumber*, 251 U.S. 385, 40 S.Ct. 182 (1920), a case the Supreme Court decided almost ninety years ago, is not controlling. As the Supreme Court observed sixty years later, *Silverthorne Lumber*'s broad statement that the exclusionary rule not only commands that illegally seized evidence "'shall not be used before the Court but that it shall not be used at all' . . . has been rejected in our later cases." *Havens*, 446 U.S. at 624, 100 S.Ct. at 1915 (quoting *Silverthorne Lumber*, 251 U.S. at 392, 40 S.Ct. at 183).

[3] Some also have argued that the exclusionary rule should be imposed to maintain judicial integrity. *See United States v. Janis*, 428 U.S. 433, 458 n.35, 96 S.Ct. 3021, 3034 (1976); *Calandra*, 414 U.S. at 355 n.11, 94 S.Ct. at 623. However, "[j]udicial integrity clearly does not mean that the courts must never admit evidence obtained in violation of the Fourth Amendment." *Janis*, 428 U.S. at 458 n.35, 96 S.Ct. at 3034. *See also Powell*, 428 U.S. at 485, 96 S.Ct. at 3048 ("While courts, of course, must ever be concerned with preserving the integrity of the judicial process, this concern has limited force as a justification for the exclusion of highly probative evidence."). Rather, "[t]he primary meaning of 'judicial integrity' in the context of evidentiary rules is that the courts must not commit or encourage violations of the Constitution," a determination whose "inquiry is essentially the same as the inquiry into whether exclusion would serve a deterrent purpose." *Janis*, 428 U.S. at 458 n.35, 96 S.Ct. at 3034. In any event, the Court does not believe its conclusion here compromises judicial integrity, especially because

7

quotation omitted). *See also Calandra*, 414 U.S. at 347, 94 S.Ct. at 619-20 (same); *United States v. Espinoza*, 256 F.3d 718, 724 (7th Cir. 2001) (same). Additionally, "although the rule is thought to deter unlawful police activity in part through the nurturing of respect for Fourth Amendment values, if applied indiscriminately it may well have the opposite effect of generating disrespect for the law and administration of justice." *Powell*, 428 U.S. at 491, 96 S.Ct. at 3051. "Because the exclusionary rule precludes consideration of reliable, probative evidence, it imposes significant costs: It undeniably detracts from the truthfinding process and allows many who would otherwise be incarcerated to escape the consequences of their actions." *Scott*, 524 U.S. at 364, 118 S.Ct. at 2020 (noting that "our cases have repeatedly emphasized that the rule's costly toll upon truth-seeking and law enforcement objectives presents a high obstacle for those urging application of the rule") (quotation omitted). *See also Janis*, 428 U.S. at 447, 96 S.Ct. at 3029; *Espinoza*, 256 F.3d at 724 ("The exclusionary rule by definition deprives courts and juries of probative evidence of a crime, and thereby offends the important societal interest in prosecuting, punishing, and deterring criminal conduct."); *Brimah*, 214 F.3d at 858 ("[B]ecause illegally-seized evidence is not inherently unreliable, . . . the exclusion of all such evidence at the sentencing phase would inhibit the ability of sentencing judges to impose fair and accurate punishments on defendants.").

### B. The Exclusionary Rule Does Not Apply Here

Application of the exclusionary rule to the issues raised in this motion to suppress is not warranted, as any additional marginal deterrence provided by its application would be vastly outweighed by the resulting societal costs. *See Scott*, 524 U.S. at 369, 118 S.Ct. at 2022; *Janis*,

---

the Court has already suppressed evidence obtained from the Geneva Residence.

428 U.S. at 453-54, 96 S.Ct. at 3032 (concluding that "exclusion from federal civil proceedings of evidence unlawfully seized by a state criminal enforcement officer has not been shown to have a sufficient likelihood of deterring the conduct of the state police so that it outweighs the societal costs imposed by the exclusion"); *Harris v. New York*, 401 U.S. 222, 225, 91 S.Ct. 643, 645 (1971) ("Assuming that the exclusionary rule has a deterrent effect on proscribed police conduct, sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in chief."); *United States v. Puglia*, 8 F.3d 478, 482 (7th Cir. 1993) ("Because the primary purpose of the exclusionary rule is to deter future Fourth Amendment violations rather than to redress [the defendant's] privacy injury, and because excluding the evidence will be unlikely to have any significant deterrent effect, use of previously-suppressed evidence in a grand jury investigation does not state grounds for dismissal of an indictment.").

Defendant has not explained how law enforcement agents would be deterred by application of the exclusionary rule to this unique set of facts and discrete issue, *see Arizona v. Evans*, 514 U.S. 1, 14-15, 115 S.Ct. 1185, 1193 (1995); *Illinois v. Krull*, 480 U.S. 340, 352, 107 S.Ct. 1160, 1168 (1987), and the Court fails to see how its application here would provide anything but the most minimal deterrent value. Application of the exclusionary rule here would deter only government conduct consciously directed toward the discovery of unlawfully-obtained evidence to be used solely in later determining what evidence was obtained lawfully. Even if the value of that deterrence were not subsumed within the value provided by the Court's earlier suppression ruling, it is minimal.

Additionally, a sanction beyond the suppression the Court has already ordered is unnecessary to deter future unlawful government conduct. *See Havens*, 446 U.S. at 626-28, 100

9

S.Ct. at 1916-17 (noting that "the deterrent function of the rules excluding unconstitutionally obtained evidence is sufficiently served by denying its use to the government on its direct case"). The law enforcement agents have already been sanctioned for their conduct through the suppression of all evidence obtained at the Geneva Residence. *See Janis*, 428 U.S. at 448, 96 S.Ct. at 3029; *Brimah*, 214 F.3d at 859 (concluding that "the application of the exclusionary rule to the government's case-in-chief still provides strong incentives for law enforcement officials to follow proper procedure in order to build as strong a case as possible against the defendant during the conviction phase of trial").

Applying the exclusionary rule here would also impose substantial societal costs. The purpose of the July 2009 hearing was to determine which laptop computer was obtained at the Geneva Residence and therefore subject to the Court's earlier suppression order. The application of the rule would inhibit that purpose, as the evidence Defendant seeks to exclude from consideration will assist the Court in making its decision. *See Calandra*, 414 U.S. at 349, 94 S.Ct. at 621 (the exclusionary rule would "unduly interfere with the effective and expeditious discharge of the grand jury's duties").

Additionally, applying the rule here would be inconsistent with the more relaxed procedures that apply to suppression hearings. "[T]he rules of evidence normally applicable in criminal trials do not operate with full force at hearings before the judge to determine the admissibility of evidence." *United States v. Matlock*, 415 U.S. 164, 172-73, 94 S.Ct. 988, 994 (1974). *See also id.* at 175, 94 S.Ct. at 995 ("There is, therefore, much to be said for the proposition that in proceedings where the judge himself is considering the admissibility of evidence, the exclusionary rules, aside from rules of privilege, should not be applicable; and the

judge should receive the evidence and give it such weight as his judgment and experience counsel."); *United States v. Watson*, 87 F.3d 927, 930 (7th Cir. 1996) (construing *Matlock*'s holding to mean "aside from privilege, exclusionary rules should not apply in a proceeding in which the court itself is considering the admissibility of evidence"). Just as in other proceedings to which the exclusionary rule does not apply, the court presiding over a suppression hearing "does not finally adjudicate guilt or innocence" and is "unimpeded by the evidentiary and procedural restrictions applicable to a criminal trial." *Calandra*, 414 U.S. at 349, 94 S.Ct. at 620. *See also Scott*, 524 U.S. at 365-66, 118 S.Ct. at 2020-21 (declining to extend the exclusionary rule to parole revocation proceedings, which are "traditionally flexible" and in which the "traditional rules of evidence generally do not apply"). Even though suppression hearings are not bound by the traditional rules and procedures applied to trials, the Court notes that Defendant Conrad had the ability to cross-examine the Government's witnesses and present his own evidence.

The parties spend considerable time debating *Watson*, which the Court finds of limited importance. There the district court did not consider a defendant's written confession in deciding whether to suppress that confession, reasoning that such consideration might impact his later determination of guilt or innocence after a bench trial. The Seventh Circuit reversed, noting its presumption that the district court would be "able to disregard the excluded confession in determining guilt or innocence." *Watson*, 87 F.3d at 930. As Defendant notes, *Watson* is somewhat distinguishable because there, unlike here, the court had not yet ruled on the legality of the government's actions. On the other hand, the Court has not decided which laptop should be suppressed, and, just as the district court in *Watson* was aided by considering the written

11

confession, considering evidence obtained at the Geneva Residence would aid the Court in making that decision. Finally, Defendant's reliance on *Murray* is unfounded. In *Murray*, the Supreme Court merely discussed the independent source doctrine, which is not relevant in deciding the Motion. *See United States v. Murray*, 487 U.S. 533, 541-42, 108 S.Ct. 2529, 2535-36 (1988).

Supreme Court and Seventh Circuit decisions in similar contexts support the Court's conclusion that the exclusionary rule does not apply here. Either the Supreme Court or the Seventh Circuit has allowed illegally-obtained evidence to be used in the following circumstances, in addition to those listed above: in grand jury proceedings, *Calandra*, 414 U.S. at 350, 94 S.Ct. at 621; in civil tax proceedings, *Janis*, 428 U.S. at 459, 96 S.Ct. at 3034; at sentencing hearings, *United States v. Krueger*, 415 F.3d 766, 779 (7th Cir. 2005); *Brimah*, 214 F.3d at 859; on habeas review of a Fourth Amendment claim where the state prisoner was given a full and fair opportunity to pursue that claim at trial and on direct appeal, *Powell*, 428 U.S. at 495 n.37, 96 S.Ct. at 3053; and in parole revocation proceedings, *Scott*, 524 U.S. at 369, 118 S.Ct. at 2022.

"Even if one rationally could assume that some additional incremental deterrent effect would be presented in isolated cases, the resulting advance of the legitimate goal of furthering Fourth Amendment rights would be outweighed by the acknowledged costs to other values vital to a rational system of criminal justice." *Powell*, 428 U.S. at 493-94, 96 S.Ct. at 3052. Accordingly, the Court declines to extend the exclusionary rule to the analysis of Defendant's Motion.

**II.     Law Enforcement Agents Obtained Exhibit 80 at the Chicago Apartment**

After carefully evaluating the evidence presented in connection with this Motion, the demeanor and credibility of each witness, and the arguments raised by both sides, the Court concludes that law enforcement agents obtained Exhibit 80 from the Chicago Apartment and obtained Exhibit 81 from the Geneva Residence. While Defendant challenged the credibility of the Government's witnesses, the Court found their testimony to be credible, and the Court has seen no evidence suggesting that Exhibit 80 came from the Geneva Residence or that Exhibit 81 came from the Chicago Apartment.[4]

Agent McDonough identified Exhibit 80 as the laptop he saw in the Chicago Apartment, based on its newness and defining features. (July 13, 2009 Tr. at 12:16-13:3, 16:9-16.) Likewise, Agent McDonough identified Exhibit 81 as the old laptop that Agent Keegan and Detective Zaglifa brought to the Chicago Apartment. (*Id.* at 13:18-14:4, 16:17-17:4.) Sergeant Zaglifa also identified Exhibit 81 as the laptop that came from the Geneva Residence, noting that

---

[4] Pointing to language in Paul Rettig's August 20, 2009, and November 3, 2009, affidavits, Defendant argues that Exhibit 80 must have been with him at the Geneva Residence on December 20, 2002. Defendant first relies on Mr. Rettig's finding that someone accessed Exhibit 80 at 6:36 a.m. on December 20, 2002, to argue that because Defendant was at the Geneva Residence at that time, Exhibit 80 must have been there as well. Mr. Rettig's November 3, 2009, affidavit, however, clarifies that the 6:36 a.m. activity could have been performed without human interaction and that the last time someone operated Exhibit 80 was between 12:01 and 12:24 a.m. on December 20, 2002. (R. 243-2 at ¶¶ 6, 7.) Defendant next argues that he was at the Geneva Residence on the evening of December 19, 2002, and that it would have been impossible for him to access Exhibit 80 between 12:01 and 12:24 a.m., leave Exhibit 80 at the Chicago Apartment, and return to the Geneva Residence by the time law enforcement agents arrived there. While Defendant's father testified that he thought Defendant was at the Geneva Residence when they spoke on the evening of December 19, 2002, Defendant's father did not provide a basis for that belief, and he did not specify the time of the phone call. In any event, even if Defendant was at the Geneva Residence when he spoke with his father on December 19, 2002, there are numerous explanations for how Exhibit 80 could have been at the Chicago Apartment when law enforcement agents arrived there the next day. Mr. Rettig's August 20, 2009, and November 3, 2009, affidavits therefore do not establish that Exhibit 80 was at the Geneva Residence on December 20, 2002.

13

it was old. (July 16, 2009 Tr. at 5:3-6:5) Sergeant Zaglifa saw another laptop at the Chicago Residence, which he said was newer than the one he saw at the Geneva Residence. (*Id.*)

Additionally, Agent McDonough testified that he recalled Agent Keegan telling him at the Chicago Apartment that the law enforcement agents recovered an old laptop from a Porsche at the Geneva Residence. (July 13, 2009 Tr. at 6:21-24.) He also testified that, before he or anyone else entered the Chicago Apartment, he observed an older brown laptop computer. (*Id.* at 7:14-19.) After Agent McDonough entered the Chicago Apartment, Defendant Conrad told him about a new laptop computer in the apartment, which Defendant said he used as his primary laptop to operate his file server. (*Id.* at 8:4-9:14.) Defendant also told Agent McDonough and Sergeant Zaglifa that he recently transferred all video and image files of child pornography from the newer laptop to an external hard drive that was also in the Chicago Apartment. (*Id.* at 9:8-14.) This evidence is relevant because Exhibit 80 has two UBS ports, which can be used to connect to the external hard drive obtained at the Chicago Apartment. (*Id.* at 19:10-17.) Exhibit 81, on the other hand, does not have a USB port and cannot be connected with the external hard drive. (*Id.* at 19:18-20:8.)

Agent Keegan's and Sergeant Zaglifa's testimony corroborates Agent McDonough's. Agent Keegan testified that before Defendant left the Geneva Residence for the Chicago Apartment, he told Agent Keegan that he thought he had some child pornography on an old laptop in his Porsche. (*Id.* at 82:8-16.) Sergeant Zaglifa witnessed this statement. (July 16, 2009 Tr. at 4:5-7.) Agent Keegan was able to view that laptop on the morning of December 20, 2002, and she testified at the July 2009 hearing that the laptop that Defendant had retrieved from his Porsche at the Geneva Residence was not the laptop identified as Exhibit 80, which she said

14

was newer than the one Defendant Conrad had retrieved from his Porsche. (July 13, 2009 Tr. at 83:5-10, 84:22-85:5.) Sergeant Zaglifa recalled joking with Defendant Conrad about the old age of the computer Defendant retrieved from his Porsche. (July 16, 2009 Tr. at 4:23-5:2.) Sergeant Zaglifa also identified Exhibit 81 as the laptop Defendant handed him at the Geneva Residence and testified that a different laptop he saw at the Chicago Apartment was newer than Exhibit 81. (*Id.* at 4:20-5:2, 5:3-6:5.)

The HP Affidavit corroborates the witnesses' testimony regarding the relative age of the laptops. It provides that Exhibit 80 was manufactured in March 1997, and Exhibit 81 was manufactured five years later. (HP Affidavit at ¶¶ 9-10.)

### III. Even Without Considering the Suppressed Evidence, the Government Has Established that Law Enforcement Agents Obtained Exhibit 80 at the Chicago Apartment

Even without considering the already-suppressed evidence or comparisons between the two laptops, the Government has established that Exhibit 80 is the laptop computer obtained at the Chicago Apartment. Agent McDonough identified Exhibit 80 as the laptop he saw in the Chicago Apartment. (July 13, 2009 Tr. at 12:16-13:3, 16:9-16.) After Agent McDonough entered the Chicago Apartment, Defendant told him about a new laptop computer in the apartment. (*Id.* at 8:4-9:14.) The HP Affidavit supports that Exhibit 80 was the laptop at the Chicago Apartment, as Exhibit 80 was less than one year old on December 20, 2002. (HP Affidavit at ¶¶ 9-10.)

Finally, Defendant told Agent McDonough and Sergeant Zaglifa at the Chicago Apartment that he recently transferred all video and image files of child pornography from the newer laptop to an external hard drive that was also in the Chicago Apartment. (July 13, 2009

15

Tr. at 9:8-14.) This corroborates the conclusion that Exhibit 80 was obtained at the Chicago Apartment because Exhibit 80 has two UBS ports, which could be used to connect with the external hard drive that law enforcement agents obtained at the Chicago Apartment. (*Id.* at 19:10-17.)

## CONCLUSION

Because the Court can consider the previously-suppressed evidence, and because the Government has established that law enforcement agents obtained Exhibit 80 at the Chicago Apartment, the Motion is denied.

Dated: November 12, 2009                    ENTERED:

 

_____
AMY J. ST. EVE
United States District Court Judge